IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 8, 2016

## RODNEY GLOVER v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Montgomery County
No. 40900017      William R. Goodman, III, Judge**

_____

### No. M2016-00619-CCA-R3-PC

_____

The Petitioner, Rodney Glover, was convicted of conspiracy to commit aggravated burglary, aggravated burglary, conspiracy to commit theft of property over $10,000, aggravated robbery, aggravated kidnapping, and theft of property under $500 and was sentenced to fifty years of incarceration to be served at 100%. This Court affirmed the judgments and sentence on appeal. *State v. Rodney Glover*, No. M2011-00854-CCA-R3-CD, 2012 WL 1071716, at *1 (Tenn. Crim. App., at Nashville, Mar. 28, 2012), *no perm. app. filed*. In 2013, the Petitioner filed a petition for post-conviction relief, claiming that he received the ineffective assistance of counsel. We affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ALAN E. GLENN, J., joined.

Gregory D. Smith, Clarksville, Tennessee, for the appellant, Rodney Glover.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; John W. Carney, Jr., District Attorney General; and Robert J. Nash, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION
### I. Facts and Procedural History

This case arises from the robbery of the ninety-year-old victim inside her home, during which she was beaten, gagged, and left in restraints for over ten hours. For this offense, a Montgomery County grand jury indicted the Petitioner for conspiracy to commit aggravated burglary, aggravated burglary, conspiracy to commit theft of property over $10,000, aggravated robbery, aggravated kidnapping, and theft of property under

$500.

## A. Trial

This Court summarized the evidence presented at the Petitioner's trial:

On October 16, 2008, Vickie Terrell went to the home of then 90-year-old Oma England, where Ms. Terrell was employed as a part-time caregiver for Ms. England. She arrived at approximately 8:00 in the morning to take Ms. England to a 9:00 appointment. Upon her arrival, Ms. Terrell was immediately "alerted" that something was wrong because the garage door was still down, which was unusual because Ms. England routinely opened the door when expecting Ms. Terrell. Ms. Terrell also noticed a screen removed from a garage window and a bench knocked over near the garage. Once she entered the garage, Ms. Terrell saw that Ms. England's 2006 Mercury Milan was gone and that several items littered the garage floor. Ms. Terrell opened the door to the home and, without stepping inside, she could see the house was "disordered." She called the victim's name twice and "backed out" of the home to telephone the Clarksville Police Department (CPD).

Officer Ben Blackmon responded to Ms. Terrell's call. He entered the home to make sure no one was inside. He noted that the home was in "extreme disarray" with furniture turned over, pictures removed from the walls, drawers pulled out, and paperwork scattered on the floor. Officer Blackmon searched the basement and main level floors before going upstairs. Each room had "stuff thrown all over" the floor. As he entered an upstairs bedroom, Officer Blackmon saw a body lying on a bed. The body was completely covered except for the feet. When Officer Blackmon saw one of the feet move, he immediately entered the room to "render aid." Officer Blackmon identified the person on the bed as the victim, Ms. England. The victim's feet and hands were bound to the bed with electrical cords. Officer Blackmon cut the electrical cords in order to release the victim. The victim told Officer Blackmon that she needed water and a doctor. Emergency medical technicians soon arrived and transported Ms. England to the hospital.

Doctor Robert Paasche, an emergency room physician with Gateway Medical Center at the time of the victim's assault, treated the victim when she arrived at the hospital. He described the victim as "an elderly woman who had been beaten quite severely." The victim suffered "intensive

bruising and swelling about both eyes and the face." She was unable to open her eyes. She also experienced tenderness and bruising to the left side of her chest, bruising and swelling to her forearms and wrists, and a "skin tear" on her left arm. The victim suffered "quite a bit of pain" from fractures to bones in her face and hands. Doctor Paasche determined that the victim had been tied to the bed for an "extended period of time." Doctor Paasche ran tests to determine the victim's "skeletal muscle enzyme level." He explained that a normal enzyme level is 100. His testing revealed that the victim's enzyme level, however, reached 1,700, indicating that the victim had lain in the same position for ten to 12 hours. At that level, the victim was at an increased risk for kidney failure.

CPD officers "processed" the victim's home in the days following the assault. All of the officers described the home as "totally ransacked." From the home, they collected latex gloves, the electrical cords used to bind the victim, and a pillowcase that had been placed over the victim's head. Several days later, Ms. Terrell found a "cigarette butt" in a corner of the foyer while she helped the victim's daughter, Nancy Williams, clean the home. Knowing that no one smoked in the home, Ms. Terrell gave the partially-smoked cigarette to Ms. Williams who then gave it to Sergeant Liane Wilson.

Within days of the assault, another CPD investigator, Detective Brad Crowe, received a telephone call concerning a suspected stolen vehicle found abandoned at a local used car lot. Detective Crowe collected more partially-smoked cigarettes and a Pepsi bottle from the abandoned Ford F-250. He also found a business card for Accurate Welding and Ornamental Iron, a Georgia business, behind the front seat of the truck. Testing performed at the Tennessee Bureau of Investigation Crime Laboratory later confirmed the presence of the [Petitioner's] and co-defendant Colin Savage's fingerprints and deoxyribonucleic acid (DNA) on several items collected from the victim's residence and the truck.

Detective Timothy Finley determined that the license plate on the abandoned truck had been stolen from a vehicle in a local Walmart parking lot. Through a trace of the truck's vehicle identification number, Detective Finley also determined that the truck belonged to the owner of Accurate Welding and Ornamental Iron, who had reported the truck stolen. The victim's car was later found in Georgia. The [Petitioner] became a suspect following interviews with the victim's stepson-in-law, John Privette. When Detective Finley learned that the stolen truck originated from Jonesboro,

3

where the [Petitioner] also lived, the investigators "became real interested in" the [Petitioner] as a suspect.

On November 8, 2008, Detective Finley received a letter from the [Petitioner] implicating Mr. Savage as a co-participant in the offenses. In the letter, the [Petitioner] also disclosed the location of many stolen items. Investigators located the items on property owned by Mr. Savage's mother and at a neighbor's home where the [Petitioner] had stayed. Investigators found jewelry, purses, coin sets, scarves, and flatware belonging to the victim at both residences. They also discovered a black nightstick in the family room of the home where the [Petitioner] was staying. Telephone records revealed that someone telephoned Mr. Savage's cellular telephone from the victim's residence at 10:36 p.m. on October 15 and again at 2:12 a.m. on October 16. Investigators also learned that the victim, who had a subscription to "Lifeline," an emergency service, received a call from the service at 11:41 p.m. on October 15.

Nancy Williams, the victim's daughter, testified that her father, Maurice Coursey, died more than 15 years ago and that the victim later married George England. Mr. England had two children, George and Nancy. Mr. England's daughter, Nancy, was married to John Privette. Mr. England died in February 2008, and the victim was living alone at the time of the offenses. Ms. Williams lived in Baton Rouge, [Louisiana] but visited the victim three or four times a year. The Terrells worked for the victim, doing household chores and maintenance and driving the victim to appointments.

Ms. Williams recalled when the offenses occurred. She said she flew straight to Clarksville upon learning of the victim's assault. The victim spent one week in the hospital and several more in a rehabilitation center. Ms. Williams described the victim's home as a "total wreck." Ms. Williams recalled Ms. Terrell's finding a partially-smoked cigarette as they cleaned the victim's home. She gave the cigarette to Sergeant Wilson. Ms. Williams recalled that a blue aquamarine necklace purchased by her father in 1948 for her mother was among the items stolen. The victim's assailants also took Mr. England's West Point ring, a large diamond ring, an "elaborate gold bracelet," and a mink coat, as well as the victim's car. The insurance value of the items totaled between $15,000 and $20,000.

The victim, Oma Nell Woodson Coursey England, testified that she was born on March 26, 1918. She recalled being assaulted as she lay asleep

4

in bed late one night. She said, "[A]t least two [men] jumped on my body and started kicking and hitting me . . ., [and] they stomped on me with their rough feet." She said the men covered her face with some kind of cloth- "like a funeral." She stopped trying to fight the men, and they bound her feet and hands. She did not see her attackers and had never met the [Petitioner] or Mr. Savage. She did, however, know Mr. Privette as her stepdaughter's husband. The victim described her two husbands as "very generous men" and said that the attackers took "[e]verything she had . . . that night." She considered herself "fortunate to have not been killed."

Joseph DeMaio, an inmate at the Montgomery County Jail, met the [Petitioner] as the [Petitioner] awaited trial. The two men became friends, and Mr. DeMaio often asked his mother to perform computer research for the [Petitioner]. Mr. DeMaio recalled the [Petitioner] admitting his involvement in the offenses. The [Petitioner] told Mr. DeMaio that Mr. Privette told the [Petitioner] that the victim kept "gold and silver bullion" and cash in a safe at her home. The [Petitioner] admitted that he entered the victim's home and that he tied up the victim when the victim began struggling with him. After restraining the victim, the [Petitioner] telephoned Mr. Savage, who assisted in ransacking the home in search of the valuables. The [Petitioner] referred to Mr. Savage as a "chicken shit" because Mr. Savage fled the home when "Lifeline" personnel contacted the home. The [Petitioner] told Mr. DeMaio that he "thought [the victim] was in her 70's; had [he] known she was that old [he] never would have [tied her up]." The [Petitioner] also told Mr. DeMaio that he and Mr. Privette owed Mr. Savage money for methamphetamine.

The [Petitioner] testified at trial and denied ever meeting Mr. DeMaio while housed at the Montgomery County Jail or telling Mr. DeMaio anything about the offenses. He affirmed the accuracy of his 2008 statement to CPD Detective Timothy Anderson. The [Petitioner] testified that he met Mr. Privette, who asked him to rob his wife's stepmother. Mr. Privette claimed the victim kept "gold bars and silver bars" in a safe in her home. Mr. Privette promised the [Petitioner] that his portion of the theft proceeds would total between $100,000 and $300,000. The [Petitioner] testified that he plotted with Mr. Privette to commit the burglary and theft because he needed the money "due to his poverty" and to support his methamphetamine addiction.

The [Petitioner] testified that he procured Mr. Savage's assistance in committing the offenses. The [Petitioner] said that he and Mr. Savage

5

traveled to the victim's home in Clarksville. Before arriving at the home, the [Petitioner] and Mr. Savage stopped at a Walmart parking lot where they stole a license plate from a vehicle to place on the truck they were driving. At the victim's home, the [Petitioner] "jimmied" the sunroom door open and found keys where Mr. Privette told him they were kept. The [Petitioner] entered the victim's home between 10:00 and 11:00 p.m. and first located a safe in the basement where he found coins and stamps. He did not, however, find the gold, silver, and cash as promised by Mr. Privette. The [Petitioner] then telephoned Mr. Savage to join him in "going through rooms" in search of valuables.

The [Petitioner] admitted putting a pillowcase over the victim's head, but he denied beating the victim. The [Petitioner] said that Mr. Savage beat the victim while the [Petitioner] searched drawers for valuables. The [Petitioner] recalled that the victim "was calling on Jesus, and [Mr.] Savage told [the [Petitioner] he was a[n] athiest. And that's the only reason [the [Petitioner] could] think that [Mr. Savage] hit her, or to knock her out." The [Petitioner] eventually told Mr. Savage to stop hitting the victim. When the [Petitioner] accidentally knocked the telephone to the floor, alerting the victim's "Lifeline" system, Mr. Savage became startled and ran from the home. The [Petitioner] faked his voice to assure the "Lifeline" personnel that everything was okay. He then loaded the victim's car with the stolen items and spent the night driving around in search of Mr. Savage. Unable to locate Mr. Savage, the [Petitioner] drove back to Georgia, where he abandoned the victim's car.

Walter Vaughn, an inmate in the Montgomery County Jail at the same time as the [Petitioner] and Mr. Savage, testified at trial that Mr. Savage told him details about the offenses. Mr. Vaughn testified that Mr. Savage admitted tying up the victim and beating her. He also told Mr. Vaughn that the [Petitioner] disguised his voice as an elderly lady's voice to dupe the "Lifeline" personnel. According to Mr. Vaughn, Mr. Savage returned to the home sometime during the night in search of more valuables before telephoning his mother in Georgia to pick him up.

With this evidence, the jury convicted the [Petitioner] of conspiracy to commit aggravated burglary, aggravated burglary, conspiracy to commit theft of property valued at over $10,000 but less tha[n] $60,000, aggravated robbery, aggravated kidnapping – all related to offenses committed against Ms. England – and theft of property valued at less than $500, related to the stolen license plate.

6

At the sentencing hearing, the parties agreed that the [Petitioner] qualified as a Range II, multiple offender based upon his history of criminal convictions. The [Petitioner] testified that his most serious prior conviction, vehicular homicide, arose from a high speed chase from the police during which his passenger and good friend was killed. During the same incident, the [Petitioner] suffered severe head injuries and was hospitalized in a coma for several months. After his trial in the instant case, the [Petitioner] testified against Mr. Savage in Mr. Savage's separate trial. The [Petitioner] expressed remorse to the victim and her family for the offenses.

. . . .

The court then ordered that the sentences in counts one and two be served concurrently (for an effective sentence of 10 years), and that the sentences in counts three and four be served concurrently (for an effective sentence of 20 years), but it ordered that each concurrently aligned pair be served consecutively to one another and to the 20 year sentence imposed in count five. Thus, the trial court imposed a total effective sentence of 50 years' incarceration.

*Glover*, 2012 WL 1071716, at *1-5 (footnotes omitted).

## B. Post-Conviction Proceedings

The Petitioner filed a petition for post-conviction relief, *pro se*, in which he alleged that he had received the ineffective assistance of counsel. The post-conviction court appointed an attorney, and the attorney filed an amended petition, alleging that the Petitioner had received the ineffective assistance of counsel because Counsel failed to review with or provide to the Petitioner the "whole of the evidence," resulting in the Petitioner not informing Counsel of facts that would have shown the jury that he was not guilty of aggravated robbery. He also alleged that Counsel failed to adequately present or investigate the theory that the Petitioner did not assault or injure the victim during the robbery. The Petitioner subsequently filed a motion requesting that his appointed post-conviction counsel be dismissed for a conflict of interest. The Petitioner's motion was granted, and the Petitioner elected to proceed *pro se*.

The post-conviction court subsequently held a hearing, during which the following evidence was presented: Counsel testified that he reviewed the State's discovery with the Petitioner at the jail. Counsel agreed that he planned to send an investigator to Georgia to

7

question witnesses. He clarified that he obtained funding for the investigator through the State and that the investigator did not go to Georgia after Counsel discussed with the Petitioner "the viability of utilizing those people [in Georgia] as witnesses and with the complications of not being to contact them through the investigator in addition to the lack of information that was provided." After this discussion, Counsel and the Petitioner "chose to proceed" without the witnesses in Georgia. One listed witness, Jason Harley, had given a statement that Counsel and the Petitioner reviewed, and "it became apparent" that Mr. Harley falsely testified against the Petitioner at Mr. Savage's request. Counsel testified, however, that Mr. Harley's false testimony did not

> change the facts that [the Petitioner] had confessed and testified on multiple occasions that [he] had been in [the victim's] room when Mr. Savage attacked the victim and so any evidence [Mr. Harley] could give . . . didn't change the fact that [the Petitioner] was ultimately involved in the attack on [the victim], by [his] own words.

Counsel testified that, during his representation of the Petitioner, Counsel addressed the trial court about issuing subpoenas for the Georgia witnesses. Counsel recalled that the trial court declined to delay the trial to procure the Georgia witnesses because Counsel had not shown that there was a material reason for them to be present at trial.

Counsel stated that his trial strategy was "anticlimactic" because the Petitioner had confessed several times and admitted to being in the victim's home, so the "goal" was not to prove that the Petitioner was not there when the crime occurred. Counsel recalled that the Petitioner maintained that he had not stolen certain items from the victim's home that were later recovered, but Counsel testified that the Petitioner's stance did not have anything to do with the main charges against him – aggravated kidnapping, aggravated assault, and aggravated robbery. Counsel testified:

> Those were charges that were going to put [the Petitioner] in prison for an extended period of time and . . . it didn't matter how much [he] stole, it was evidence that [he] took something in the course of a robbery, in the course of a kidnapping, and in the course of a burglary and those were the issues we were trying to address that should have helped minimize any long-term prison sentence.

Counsel recalled that the State offered the Petitioner twenty-five years to serve at 100%, and Counsel believed that he would be able to negotiate the sentence down to eighteen years. The Petitioner, however, was adamant that the case go to trial despite Counsel warning him it was not in his best interest. Counsel testified that there was

8

"overwhelming evidence" against the Petitioner.

Counsel agreed that Mr. Savage gave several inconsistent statements about the Petitioner's involvement, but Counsel stated that because the Petitioner had admitted to being a part of the crime, the inconsistencies in Mr. Savage's statements were not helpful to his defense. Counsel testified:

> I was belaboring under the belief that [the Petitioner] did not know how the victim was tied up, so when [the Petitioner] went into [the victim's] home, it was . . . my belief prior to trial that at some point after Mr. Savage had left the [the Petitioner] could not locate him that evening, [Mr. Savage] had come back and done additional harm [to the victim]. [The Petitioner's] statements . . . w[ere] that the [victim's] house when [he] left was not in disarray, . . . [t]hat [the victim] had not been tied up when [the Petitioner] was present[.] . . . [S]o we went to trial with the hope of eliminating some of the elements of the charges against [the Petitioner], which we were successful at, the jury did not find that [the Petitioner] committed serious bodily injury in the acts done upon [the victim], but also we had hoped to be able to show that Mr. Savage at some point had gone back to the home and had taken more things and had actually done the harm to [the victim] . . . But once [the Petitioner] testified, all that was out the window. It became apparent during the trial that Mr. Savage did not go back and that [the Petitioner] was in the room when [the victim] was tied up, so that changed our course in respect to the second part of our tactic at trial.

Counsel testified that he did not present to the jury the theory that Mr. Savage had returned to the victim's home alone and furthered the crime without the Petitioner because "there was no evidence that we could collect or witnesses that saw him re-enter the home and [the victim] didn't have any recollection and made no statement as to that occurring."

On cross-examination, Counsel testified that he had been practicing law since 2005 and that he was the Petitioner's fifth appointed attorney in this case. Counsel testified that the Petitioner was facing up to one hundred and twenty-five years if convicted and that his case "became the crux of [Counsel's] practice. Counsel spent "an enormous amount of time with [the Petitioner], up to almost the neglect of [Counsel's] practice." Counsel worked "long hours" "very diligently" on the Petitioner's case and met with the Petitioner "more than any other client" Counsel had ever represented. Counsel explained to the Petitioner his possible sentence, the elements of the charges for each count, reviewed and discussed the evidence contained in discovery. The Petitioner

was "active" in discussing his case, and the two men discussed trial strategy which was to show that Mr. Savage injured the victim. That strategy "fell apart pretty quickly," but Counsel was able to convince the jury that the victim did not suffer serious bodily injury, which lessened the Petitioner's exposure to a longer sentence.

Regarding the Petitioner's decision to testify, Counsel went over his prospective testimony, which included the Petitioner admitting to being present at the victim's house. Counsel hoped that the Petitioner would be seen as a "sympathetic witness" and an "unwitting participant" in Mr. Savage's crime. Instead, the Petitioner further implicated himself through his testimony and made statements that he had never disclosed to Counsel. Counsel said that, if he had known how the Petitioner was going to testify, he "would have advised [the Petitioner] strongly not to take the stand."

The Petitioner testified that, based on the facts of the case, he felt that his charges were too severe. He agreed that he testified twice under oath in this case, and agreed that he implicated himself by testifying that he was inside the victim's home. The Petitioner agreed that he stole items from the victim's home and disguised his voice as the victim's when emergency services called to check on her. He agreed he had stolen the victim's vehicle. He agreed that he gave an extensive statement to the police about his involvement.

The post-conviction court issued an order denying the Petitioner relief, finding, relevant to this appeal, that the Petitioner had not established by clear and convincing evidence that Counsel was ineffective for failing to subpoena witnesses from out-of-state.[1] The post-conviction court stated:

> [The] Petitioner contends [that Counsel] failed to adequately investigate the facts, interview witnesses, consider possible defenses, or matters which might serve to mitigate the offense. The proof at [the post-conviction hearing] established that [Counsel] reviewed materials and assembled witness statements and that he, with the consent of the Petitioner, developed a trial strategy in an effort to mitigate the offense, and to establish that the Petitioner was not responsible for any bodily injury. Therefore, this contention is without merit.
>
> . . . .
>
> [The] Petitioner indirectly contended that there were witnesses that were not called, which [the] Petitioner now contends should have been

---

[1] The post-conviction court made additional findings which, because they are not part of the Petitioner's issue on appeal, we elect to omit.

10

presented. [The] Petitioner presented no proof at the [post-conviction] hearing that the witness or witnesses he desired to have been called would have presented testimony that would have been admissible and material to his defense. Consequently, there is [no] showing that the failure to call such witness or witnesses was prejudicial.

The post-conviction court concluded that the Petitioner had failed to establish his ineffective assistance of counsel claim by clear and convincing evidence. It is from the post-conviction court's judgment that the Petitioner now appeals.

## II. Analysis

The Petitioner contends on appeal that the post-conviction court erred when it denied his petition because he received the ineffective assistance of counsel because Counsel failed to subpoena witnesses from Georgia that the Petitioner requested and because Counsel did not interview the lead detective in the case. The State responds that Counsel's decision to proceed without the witnesses from Georgia was a reasonable, strategic decision and that the Petitioner has not met his burden on appeal because he failed to present those witnesses at the post-conviction hearing. The State further responds that the Petitioner has not shown how interviewing the lead detective would have aided in his defense or affected the outcome of the case, and that the Petitioner failed to present the lead detective as a witness at the hearing. The State contends that the record supports that Counsel provided effective assistance. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates against it. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely de novo review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6

S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975).  The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment.  Second, the [petitioner] must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable.  Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases.  *Baxter*, 523 S.W.2d at 936.  To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).  When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances.  *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988).  The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90.  In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462.  Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation.  *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996).  In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)).  Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result.  *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980).  "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation.  However, deference to

12

matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994). To establish prejudice, the Petitioner must: (1) produce the witness at his post-conviction hearing; (2) show that through reasonable investigation, trial counsel could have located the witness; and (3) elicit both favorable and material testimony from the witness. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

We conclude that the post-conviction court did not err when it determined that the Petitioner had not proven by clear and convincing evidence that he had received the ineffective assistance of counsel. With regard to the witnesses in Georgia, Counsel testified that he made the decision to proceed without the witnesses, in part because he had no way of contacting them and no information to provide his investigator as to their whereabouts, and in part because the trial court denied his request to delay the trial in order to find the witnesses. Counsel testified that his strategy at trial changed as it became clear that the Petitioner had given several statements implicating himself in the crime. Counsel opted to minimize the Petitioner's exposure to the "aggravated" elements of the crime: tying the victim up, beating her, etc. The Georgia witnesses would not have aided in this strategy, and thus Counsel elected to proceed without further searching for them. The Petitioner has not shown by clear and convincing evidence that he received the ineffective assistance of counsel based on Counsel's trial strategy in this respect. Furthermore, in order to grant the Petitioner relief, he is required to present those witnesses during the post-conviction hearing and establish that Counsel could have located them. *Black*, 794 S.W.2d at 757. The Petitioner has done neither in this case and thus, he is not entitled to relief.

We also conclude that the Petitioner has not shown that Counsel was ineffective for failing to interview the lead detective. There is ample evidence that Counsel thoroughly investigated and prepared this case: he reviewed discovery with the Petitioner, hired an investigator to interview neighbors and other possible witnesses, met with the Petitioner numerous times, and worked "diligently" in preparation for trial. The State's evidence against the Petitioner was overwhelming, particularly due to the fact that the Petitioner admitted to some extent his involvement in the crime. Counsel was able to

13

exploit where the State had not proven the Petitioner's involvement and the jury found that the Petitioner had not committed bodily harm against the victim. The Petitioner has not proven by clear and convincing evidence that had Counsel interviewed the detective, Counsel would have been more prepared to go to trial. We conclude that Counsel was diligent and effective in his representation of the Petitioner. Accordingly, we conclude that the Petitioner is not entitled to relief.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the post-conviction court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE